# UNITED STATES DISTRICT COURT

__NORTHERN__ DISTRICT OF __ILLINOIS, EASTERN DIVISION__

UNITED STATES OF AMERICA

v.

ANDRE BEARD, aka "Diesel"

**FILED**
FEB 8 2010
FEB X 8 2010
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

CRIMINAL COMPLAINT

**UNDER SEAL**

CASE NUMBER: MAGISTRATE JUDGE COLE
**10 CR 0099**

I, Brooklyn A. Riordan, being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about ___June 18, 2008___ in ___Cook___ county, in the ___Northern___ District of ___Illinois___ defendant(s) did,

knowingly and intentionally possessed with intent to distribute and distributed controlled substances, namely, 50 grams or more of mixtures and substances containing a detectable amount of cocaine base in the form of crack cocaine, in violation of Title 21, United States Code, Section 841(a)(1).

I further state that I am a(n) ___Special Agent with the Federal Bureau of Investigation___ and that this complaint is based on the following facts:

please see the attached affidavit.

Continued on the attached sheet and made a part hereof:   X  Yes   ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

February 8, 2010
Date

at Chicago, Illinois
City and State

Hon. Jeffrey Cole
Magistrate Judge

_____
Signature of Judicial Officer

STATE OF ILLINOIS )
) 
COUNTY OF COOK )

### AFFIDAVIT

I, Brooklynn A. Riordan, Special Agent of the Federal Bureau of Investigation, United States Department of Justice, having been duly sworn under oath, states as follows:

### I. INTRODUCTION

1. I am a Special Agent ("SA") with the United States Department of Justice, Federal Bureau of Investigation ("FBI"), and have been so employed for approximately five years. I have received specialized training in corruption matters and narcotics and dangerous drug investigations while employed as a Special Agent. I am familiar with and have participated in all of the normal methods of investigations, including but not limited to Title III investigations, visual surveillance, electronic surveillance, the use of search warrants, informant and cooperating witness debriefings, pen registers, document analysis, and the utilization of undercover agents/officers. I have been personally involved in investigations of controlled substances-related offenses involving the possession, sale, and distribution of cocaine, heroin, and crack cocaine in the Chicago and metropolitan area, and investigations involving distribution of these substances by members of Chicago area street gangs.

2. I am currently assigned to the Criminal Enterprise Squad, which investigates street gangs in and around the City of Chicago. Prior to becoming a Special Agent with the FBI, I was a Forensic Scientist for six years with the Ohio Bureau of Criminal Identification and Investigation. As part of my current assignment, I have investigated criminal violations

1

of the Controlled Substance Act as found in Title 21 of the United States Code, as well as related violations found in Title 18 of the United States Code. Based on my training and experience, I am familiar with the ways in which individuals conduct their drug-related business, including, but not limited to their: (a) methods of distributing narcotics; (b) use of telephone communication devices; and (c) use of code words to identify themselves and the nature of the communication, and to conduct their drug-related transactions.

3. The information contained in this Affidavit is based on: my training and experience; the training and experience of my fellow agents and law enforcement officers; my conversations with and review of reports prepared by agents in the FBI, as well as other law enforcement agents and officers; the results of physical surveillance; information provided by cooperating sources; law enforcement interviews of witnesses; review of recordings of consensually recorded conversations and conversations intercepted pursuant to Court orders authorizing the interception of wire communications. Since this Affidavit is being submitted for the limited purpose of establishing probable cause as set forth herein, I have not included each and every fact known to me concerning this investigation.

4. This Affidavit is made for the purpose of establishing probable cause in support of a Criminal Complaint charging that on or about on June 18, 2008, ANDRE BEARD, aka "DIESEL," knowingly and intentionally possessed with intent to distribute and distributed controlled substances, namely, 50 grams or more of mixtures and substances

containing a detectable amount of cocaine base in the form of crack cocaine, in violation of Title 21, United States Code, Section 841(a)(1).

## II. OVERVIEW OF CONSPIRACY

5.  Since February 2008, the Chicago Police Department ("CPD") and FBI have been conducting a joint investigation involving various members of the Four Corner Hustlers street gang who operate a drug trafficking organization located on the west side of Chicago, specifically, in the area located north of the Eisenhower Expressway, south of North Avenue, west of Laramie Avenue, and east of Austin Avenue. During this investigation, law enforcement used various techniques, including the use of cooperating sources, controlled purchases of narcotics and surveillance. Based on investigation, surveillance, and information from a cooperating source, I am aware that BEARD, a member of the Body Snatcher Faction of the Four Corner Hustler street gang, is supplying wholesale quantities of cocaine base in the form of crack cocaine ("crack cocaine") and heroin to other individuals and/or members of the Four Corner Hustlers street gang located on the West side of Chicago and Milwaukee, Wisconsin.

6.  In early 2008, a Cooperating Source (CS)[1] began providing information about ANDRE BEARD, aka "DIESEL," a member of the Four Corner Hustler street gang. CS is

---

[1] CS agreed to cooperate with the government in return for financial compensation. CS has been arrested over 20 times for offenses which include narcotics offenses, unlawful use of a weapon, burglary, and other offenses. CS has 8 convictions. The FBI has paid over $18,000 to the CS for his cooperation.

3

a former member of the Vice Lord ("VL") street gang in Chicago, Illinois. CS first began providing information to the FBI in approximately April 2007. From 2007 until approximately April 2009, FBI agents spoke to CS in person, or telephonically, on numerous occasions. A substantial portion of CS's information regarding BEARD has been corroborated by independent investigation including physical surveillance, conversations with other law enforcement officers, telephone record analysis, consensual telephone recordings, video and audio recordings, as well as a controlled purchase of narcotics with BEARD. In April 2009, agents learned that the CS was involved in narcotics related activity and ceased using CS as a source of information.

## III. PROBABLE CAUSE FOR REQUESTED COMPLAINT

### A. Calls Proceeding CS's Controlled Purchase of Crack Cocaine from BEARD on June 18, 2008

7. On June 16, 2008, at approximately 1:20 p.m. at the direction of agents, CS placed a consensually recorded telephone call to BEARD to arrange for the purchase of crack cocaine. BEARD answered the phone,[2] at which time CS stated, "my man coming up tomorrow right, he going to be up here early, he gonna need a ride out south out there like on the low end." [CS had a customer who wanted an amount of crack cocaine.][3] BEARD

---

[2] The basis of the identification of BEARD in this Affidavit is set forth in footnote 4.

[3] At various points in the Affidavit, I will offer my interpretations of certain recorded conversations/meetings in brackets and otherwise. My interpretations of these conversations are based on my knowledge of the investigation to date and review of other interceptions, the content and context of the conversations, prior and subsequent conversations, the results of physical surveillance, conversations with other officers and agents, and my experience and familiarity with these types of investigations. Finally, the summaries of conversations do not include all potentially

4

then said, "right, right, I know what you are talking about though, like a 5, 550 the early, 6 somewhere out there." [Beard confirmed CS request for crack cocaine.] CS confirmed and BEARD said, "alright." CS asked what the "ticket was on taking him out there." BEARD responded, "1 (U/I)." [CS asked BEARD how much the narcotics would be and BEARD stated a price for the 63 grams.] CS informed BEARD that BEARD "had to fix the car and make sure it was running good, because there is a lot of traffic out there and [CS] does not want it to cut off." [CS indicated to BEARD that he wanted the cocaine cooked into crack cocaine.] BEARD responded in the affirmative and then CS asked if "it" [the drug transaction] was going to happen in the morning. BEARD told CS that if it happened today he could "park the car." [BEARD informed CS that BEARD was waiting on a supply of cocaine and would hold the narcotics for CS if he obtained them that day.] CS told BEARD to let CS know because "he can catch another cab on out there." [CS indicated that CS would try and get the narcotics from another supplier if BEARD could not obtain them.] BEARD said ok, and CS told him to call CS and let CS know.

8. On June 17, 2008, at the direction of agents, CS placed several consensually recorded telephone calls to BEARD to arrange for the purchase of crack cocaine:

a. During a call at approximately 12:09 p.m., BEARD said that he was waiting on his guy to "come slide on" him. [BEARD told CS he was still waiting for his supply of

---

criminal conversations recorded during this investigation, or all statements or topics covered during the course of the recorded conversations. They do not represent finalized transcripts and may not represent the entire conversation that occurred between the identified individuals.

crack cocaine.] CS stated, "my buddy up here already." [CS told BEARD his customer was ready to make the purchase.] BEARD then stated, "ok, I'll give you a holler back and let you know when he slides on me." [BEARD told CS he would phone back when he received the crack cocaine.] CS asked BEARD if he knew what time, and BEARD told him, "probably about 1:00 or 2:00 or something like that." CS then asked BEARD if he was "for sure," and BEARD stated that he would call the CS back;

b. During a call at approximately 12:48 p.m., BEARD told CS that it would be about an hour and no longer. CS asked BEARD if he was for sure, and BEARD responded that his "guy was on the road." [BEARD stated that his supplier was on the way to deliver the narcotics.] CS asked BEARD to call CS back in an hour;

c. During a call at approximately 2:00 p.m., BEARD answered the call, and CS asked him if he was ready. BEARD stated, "I'll be coming down your way in about thirty minutes." [BEARD stated that he would have the crack cocaine for CS in thirty minutes.] CS told BEARD that CS's customer needed to leave. BEARD then stated, "ok, I can't get to him no quicker, but if he want to come back tomorrow, or whatever...."

**B.    June 18, 2008 CS Controlled Purchase of Crack Cocaine from BEARD**

9. On June 18, 2008, CS conducted a controlled purchase of approximately 63 grams of crack cocaine for $1600.00 from BEARD.

a. At approximately 11:13 a.m., CS placed a consensually recorded call to BEARD. BEARD answered the call and CS told BEARD, "my buddy told me to call you,

6

he wanted to slide back up this way, trying to see what is going on." BEARD asked, "your buddy from yesterday?" CS confirmed and BEARD explained that he had just woken up and he would be about an hour. CS told BEARD that it would take his buddy 45 minutes to get to the area. BEARD told CS that he would be ready around 12:30 p.m. BEARD then told CS that he had to take his girl downtown, and that he would probably have to leave "it," [the crack cocaine] with CS.

      b.      At approximately 12:13 p.m., agents searched CS for the presence of weapons, drugs or excessive money with negative results, equipped CS with a concealed audio/visual recording device and provided CS with $1700.00 in cash in order to purchase approximately 2.25 ounces, or 63 grams, of crack cocaine. At approximately 12:20 p.m., CS received a phone call which was recorded on the concealed recorder worn by CS from BEARD indicating that BEARD would be there in 15 to 20 minutes. CS departed the staging area with an FBI Task Force Officer (TFO).

      c.      At approximately 12:27 p.m., CS and the TFO arrived in the area of the 5800 block of Ohio Street and Menard Avenue, Chicago, Illinois. FBI Special Agents and TFOs ("surveillance") maintained continuous surveillance of the CS during the controlled purchase.

      d.      At approximately 12:58 p.m., CS received an incoming push-to-talk call from BEARD. Both sides of the call were recorded over the audio/video recorder that the CS was wearing. During the call, BEARD asked CS if CS was down there, to which CS replied in

7

the affirmative. BEARD stated: "I should pull up in about five minutes." CS asked BEARD which way he was coming and BEARD stated that he would let him know when he got over there.

e. At approximately 1:18 p.m., CS received an incoming push-to-talk call from BEARD. Both sides of the call were recorded over the audio/video recorder that the CS was wearing. During the call, BEARD told CS that he was coming down Ohio Street. At this time, the CS left the vehicle of the TFO and crossed to the opposite side of the street to wait on BEARD.

f. At approximately 1:23 p.m., surveillance observed a purple colored van (the "purple van") parked on the west side of Menard Avenue, just north of Ohio Street. At this time, CS approached the driver's side of the van, where BEARD[4] was present. Based upon my review of the audio and video recordings, and from information provided by the CS during a later debriefing, the following occurred during the meet at the purple van. BEARD and CS engaged in conversation at which time, BEARD handed CS an item through the driver's side window and CS gave BEARD cash for the crack cocaine. At approximately 1:24 p.m., surveillance observed CS return to the vehicle of the TFO. CS and the TFO then

---

[4] The identification of BEARD in this affidavit is based upon the following: First, I have been able to identify BEARD's voice because that voice has been recorded via consesually recorded telephone calls by CS and during recorded meetings with CS. Second, I have reviewed the audio/video recording made by the recorder activated on CS during the purchase. From the video and the surveillance observations of the purchase, it is clear that there is only one person in the purple colored van speaking with and handing CS the crack. I recognize that person to be BEARD from his prior arrest photograph.

8

headed back to the staging area. At approximately 1:31 p.m., CS arrived at the staging area with TFO, and at approximately 1:32 p.m., surveillance was terminated.

g. At approximately 1:35 p.m., the audio/visual recording device was deactivated. CS provided agents with a plastic bag containing a off-white rock-like substance that the agents in their training and experience recognized as crack cocaine and returned $100.00. Agents then searched CS for additional contraband and money with negative results.

h. The suspected crack cocaine obtained during the controlled purchase was subsequently analyzed by the Drug Enforcement Administration (DEA) North Central Laboratory. The substance was found to weigh 61.7 grams of mixtures and substances containing cocaine base and sodium bicarbonate.

## IV. CONCLUSION

11. Based on the foregoing, your Affiant respectfully submits that there is probable cause to believe that on or about on June 18, 2008, BEARD knowingly and intentionally distributed a controlled substance, namely in excess of 50 grams of mixtures and substances containing a detectable amount of cocaine base in the form of crack cocaine, both in Violation of Title 21, United States Code, Section 841(a) (1).

BROOKLYNN A. RIORDAN
Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN TO BEFORE ME
this 8th day of February, 2010

HON. JEFFREY COLE
United States Magistrate Judge